AARON BLOCK, ESQ.*
MAX MARKS, ESQ.*
**THE BLOCK FIRM LLC**
309 East Paces Ferry Road, Suite 400
Telephone: (404) 997-8419
aaron@blockfirmllc.com
max.marks@blockfirmllc.com

ROSHAN D. SHAH, ESQ.
**SHAH LAW GROUP, LLC**
1040 Broad Street, Suite 304
Shrewsbury, NJ 07702
Telephone: (732) 398-6545
Facsimile: (732) 576-0027
rshah@shahlg.com
*Attorneys for Plaintiff Martha Brewton, on behalf
of herself and all others similarly situated*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## NEWARK VICINAGE

| | |
|---|---|
| MARTHA BREWTON, on behalf of herself and all others similarly situated, | Civil Action No. |
| Plaintiff, | **CIVIL ACTION** |
| vs. | |
| GLENMARK PHARMACEUTICALS INC., USA, | **CLASS ACTION COMPLAINT** |
| Defendant. | **JURY TRIAL DEMANDED** |

## PRELIMINARY STATEMENT

1.     On behalf of herself and all other Alabamians similarly situated, Martha Brewton brings this Alabama law economic loss class action against Defendant Glenmark Pharmaceuticals, Inc. Plaintiff anticipates moving to consolidate this action with *Butler et al. v. Glenmark Pharmaceutical, Inc.*, No. 2:24-cv-080907-EP-JSA, because the two cases involve "common question[s] of law [and] fact." Fed. R. Civ. P. 42(a).  Plaintiff further identifies these cases as related pursuant to Local Rule 40.1(c) because they relate to the same course of conduct by Glenmark, and Plaintiff respectfully suggests that this case should be assigned to District Judge Evelyn Padin pending consolidation.

## JURISDICTION AND VENUE

2.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1332(d). Plaintiff is a citizen of Alabama and Defendant is a citizen of New Jersey and Delaware. The amount in controversy exceeds $5,000,000.

3.     The Court has personal jurisdiction over Defendant because its headquarters are in New Jersey at 750 Corporate Drive, Mahwah, New Jersey 07430-2009.

4.     Venue is proper in this District because Defendant is headquartered in Bergen County and because Defendant's conduct giving rise to this case occurred therein.

## PARTIES

5.     Martha Brewton, a resident of Alabama, purchased and received Glenmark potassium chloride extended-release capsules at least three times in late 2023 and early 2024, paying a portion of the cost out-of-pocket each time. She was subsequently notified by her pharmacy, Walgreens, that she purchased adulterated and recalled lots that were unfit for consumption. On June 4, 2025, through undersigned counsel, she gave written pre-suit notice to Glenmark's counsel by email and U.S. Mail of her claims and putative class claims for breach of warranty, fraud, and Alabama's Deceptive Trade Practices Act (even though, as addressed below, ADTPA notice was unnecessary because Glenmark does not maintain a place of business and does not keep assets within Alabama).

6.     Glenmark    is    the    North    American    arm    of    Glenmark Pharmaceuticals, a multinational pharmaceutical company headquartered in Mumbai. Glenmark's North American arm markets dozens of generic pharmaceuticals in the United States from its offices in New Jersey, including coordinating the manufacture, marketing, and distribution of the pills at issue in this case.

## FACTUAL ALLEGATIONS

7.     Potassium chloride extended-release capsules are longstanding, essential medicines primarily indicated for the treatment of hypokalemia, or

low potassium. Several drugmakers offer generic and branded potassium chloride drugs. Potassium chloride is one of the country's most commonly prescribed medicines, ranked #35 by one count, with over 4.5 million patients taking almost 17 million prescriptions a year.[1] In addition to its therapeutic properties, however, excessive potassium chloride can induce cardiac arrest, and it is so used in the lethal injection protocol.

8.     According to the FDA's Orange Book, where generic drugmakers like Glenmark position their drugs as equivalent to branded drugs (and other generics), Glenmark has marketed potassium chloride in the United States since at least 2016.

9.     On or about June 25, 2024, the FDA revealed that Glenmark was "recalling 114 batches"—millions of potassium chloride capsules—due to "Failed Dissolution Specifications."[2] FDA designated the recall as Class I, the most serious type, used where "there is a reasonable probability that the use of, or exposure to, a violative product will cause serious adverse health consequences or death."[3]

---

[1] ClinCalc.com, Drug Usage Statistics, Potassium Chloride, https://clincalc.com/DrugStats/Drugs/PotassiumChloride.

[2] FDA, Glenmark Pharmaceuticals Inc., USA Issues Voluntary Nationwide Recall for Potassium Chloride Extended-Release Capsules, USP (750 mg) 10mEq K Due to Failed Dissolution, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/glenmark-pharmaceuticals-inc-usa-issues-voluntary-nationwide-recall-potassium-chloride-extended#recall-announcement.

[3] FDA, Recalls Background and Definitions, https://www.fda.gov/safety/industry-guidance-recalls/recalls-background-and-definitions.

10.    According to Glenmark's press release, the defect "may cause high potassium levels, also known as hyperkalemia, which can result in irregular heart beat that can lead to cardiac arrest."[4] Patients "who require chronic use of potassium chloride extended-release oral capsules, especially in those patients with underlying comorbidities or conditions that cause altered excretory mechanisms for potassium such as hypertension, heart failure, or renal dysfunction, there is a reasonable probability of developing hyperkalemia that may lead to" consequences including "cardiac arrythmias, severe muscle weakness, and death." In other words, the most typical patients—those who depend on Glenmark every day to manage chronic conditions—are the most vulnerable to "severe potential life threatening adverse events" and death.

11.    Based on the size and expiration date range, the dissolution defect was likely present—and either undetected or disregarded—for several years. The scale of the known problems, particularly given Glenmark's history of quality problems, suggests a systematic disregard for drug safety.

12.    Glenmark falsely represented that its potassium chloride met USP standards. Glenmark expressly markets its potassium chloride extended-release capsules as USP-complaint in the name of the drug, on the bottle, and

---

[4] FDA, Glenmark Pharmaceuticals Inc., USA Issues Voluntary Nationwide Recall for Potassium Chloride Extended-Release Capsules, USP (750 mg) 10mEq K Due to Failed Dissolution, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/glenmark-pharmaceuticals-inc-usa-issues-voluntary-nationwide-recall-potassium-chloride-extended#recall-announcement.

on marketing materials: "Potassium Chloride Extended-Release Capsules, USP."[5] Despite this labeling and marketing, Glenmark failed to use and/or meet at least the USP standards governing minimum dissolution time and requiring CGMP compliance. In practice, Glenmark's drug was effectively a rapid-release drug more suitable for an execution rather than the "extended-release" drug the company promised patients.

13.    Glenmark's false representations were material; without them, Glenmark could not sell its potassium chloride drugs. The USP designation carries not just legal significance but also marketing significance. Distributors, pharmacies, and pharmacists do not trade in USP-listed drugs that are not USP compliant. Patients, as well as the physicians who prescribe drugs and the pharmacies who dispense them, expect drugmakers like Glenmark to comply with USP and FDA standards. That expectation is a function of law, industry practice, and social norms all down the chain of distribution.

14.    To take another example, drugmakers contractually warrant to their immediate "customers"—distributors and pharmacies—that their drugs comply with USP and FDA standards, including CGMP standards and therapeutic equivalence standards. Generic drugmakers like Glenmark must

---

[5] Glenmark, RX Generic Product Catalog, https://glenmarkpharma-us.com/potassium-chloride-extended-release-capsules-usp/ (describing the product as the "Generic Version of Potassium Chloride Extended-Release Capsules USP [Actavis]") (brackets in original).

also represent to pharmacy "linkage" databases and insurers that their drugs are therapeutically equivalent to branded drugs to compete for business.[6] Marketing a generic drug generally depends on the drug being listed as therapeutically equivalent to the branded version in the FDA's Orange Book, which requires, *inter alia*, the generic to comply with the "identical compendial [i.e., USP] or other applicable standard of . . . purity" as the branded drug.[7] Absent Orange Book listing, prescribers, dispensers, payers, and patients are unlikely to substitute a generic for the branded version or a listed generic. Thus, but for the representation of compliance with the applicable USP standards, Glenmark could not sell its drug to downstream patients via the pharmaceutical supply chain.

15.    Physicians, who cannot be expected to test individual drugs, rely on drugmakers to comply with their claimed drug safety and quality requirements. And patients, who are even less able to discern drug quality, must rely on drugmakers to make and distribute compliant drugs in the first instance. As the FDA explains, "[c]onsumers expect that each batch of medicines they take will meet quality standards so that they will be safe and

---

[6] *See generally United States Pharm. Corp. v. Trigen Labs, Inc.*, 2011 U.S. Dist. LEXIS 13637 (N.D. Ga. 2011) (explaining how drugmakers use linkage databases to market their drugs to dispensers and other health care providers).
[7] 21 CFR § 314.3(b).

effective."[8]

16.    Had Glenmark disclosed its deviation from USP, CGMP, and therapeutic equivalence requirements, the company could not sell its drugs. Physicians would not have prescribed them, pharmacies would not have stocked and dispensed them, and patients would not have purchased them. Glenmark knew that its misrepresentations regarding USP, CGMP, and therapeutic compliance were necessary to sell its adulterated drugs, and Glenmark intended for everyone down the chain of distribution to rely on those representations.

17.    Glenmark's adulterated drugs were worth zero dollars. Adulterated drugs must be incinerated, not sold for profit. Glenmark must therefore reimburse purchasers who did not receive the benefit of their bargain.

18.    On information and belief, it is likely that Glenmark sold adulterated potassium chloride that was not included in the recalls because it had already expired by the time Glenmark's defects became public. Glenmark knew or should have known that any such potassium chloride failed to meet the required USP, CGMP, and therapeutic equivalence standards, yet

---

[8] FDA, Facts About the Current Good Manufacturing Practice (CGMP), https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practice-cgmp.

Glenmark nevertheless chose to sell it based on the false representation that the medicine was compliant. The statute of limitations for claims related to purchases of all such adulterated-but-not-recalled pills has been tolled by Glenmark's fraudulent concealment.

19.    This was not Glenmark's first or only serious quality deficiency. Since 2019, Glenmark has received two FDA warning letters citing the company for "significant violations of Current Good Manufacturing Practice (CGMP) regulations for finished pharmaceuticals," rendering the company's drugs "adulterated within the meaning of" the Food, Drug, and Cosmetic Act.[9] Among other violations, the FDA cited Glenmark for "fail[ing] to thoroughly investigate any unexplained discrepancy or failure of a batch or any of its components to meet any of its specifications," "fail[ing] to establish adequate written procedures for production and process control designed to ensure" Glenmark's drugs "have the identity, strength, quality, and purity they purport or are represented to possess," "fail[ing] to establish and follow required laboratory control mechanisms," and "fail[ing] to prepare batch production and control records with complete information." Both warning letters remain open, demonstrating that Glenmark has yet to correct these

[9] FDA, Warning Letter Database, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/glenmark-pharmaceuticals-limited-582701-10032019 (Warning Letter dated October 3, 2019); https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/glenmark-pharmaceuticals-limited-637314-11222022 (Warning Letter dated November 22, 2022).

serious problems.

20.    In addition, in recent years Glenmark has been forced to undertake over sixty other recalls, affecting tens of millions of pills for serious quality problems, ranging from the presence of carcinogens, to the presence of filth like mold, to impurities and non-sterility, to unidentified "cGMP deviations" severe enough to warrant a recall.[10]

21.    Glenmark's overall course of conduct shows that it has chronically and systemically chosen to put its own profits ahead of patient health and safety. For Plaintiff and all members of the Class she seeks to represent, Glenmark enriched itself by selling worthless, adulterated prescription medication based on affirmative misrepresentations that its potassium chloride had the required quality that patients expect and on which they are entitled to rely.

## CLASS ALLEGATIONS

22.    Plaintiff seeks to represent the following class (the "Class"):

> All natural persons in Alabama who purchased Glenmark's potassium chloride product that was recalled due to failed dissolution standards or that similarly failed to meet the applicable USP, CGMP, and therapeutic equivalence requirements but was not recalled.

---

[10] *See* FDA, Enforcement Report for Glenmark, https://www.accessdata.fda.gov/scripts/ires/index.cfm#tabNav_advancedSearch.

23. Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and any of its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

24. All members of the Class have suffered a substantially similar injury: the purchase of a worthless, adulterated drug.

25. Adulterated prescription medicine that cannot lawfully be sold can be considered "worthless" and allow the plaintiff to recover the full purchase price in damages.

26. Subject to additional information obtained through further investigation and discovery, the definition of the Class may be revised as appropriate.

27. *Numerosity*. The members of the Class are so numerous that individual joinder is impracticable. Upon information and belief, Plaintiff reasonably estimates that there are at least thousands of members in the Class—and likely many more given that Glenmark's recalls alone involved more than 46 million capsules. Although the precise number of members of the Class is unknown to Plaintiff, the true number of members of the Class may

be determined through discovery, such as through pharmacy dispensing records and pharmacy benefits manager records. Due to the prevalence of potassium chloride use and the number of affected capsules, there are likely tens of thousands of Alabama class members.

28.    *Existence and predominance of common questions of law and fact.* Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members. These common legal and factual questions include, but are not limited to, the following:

> a.    whether the potassium chloride capsules at issue were adulterated due to failed dissolution specifications;
>
> b.    whether the potassium chloride capsules at issue failed to meet USP, CGMP, and therapeutic equivalence requirements;
>
> c.    whether Defendant knew or should have known that the potassium chloride capsules tablets were adulterated and failed to meet USP, CGMP, and therapeutic equivalence requirements;
>
> d.    whether adulterated and contaminated potassium chloride capsules are worthless;
>
> e.    whether providers, pharmacists, and patients rely on

Glenmark's affirmative USP, CGMP, and therapeutic equivalence representations;

f.    whether the designation "USP" regarding the capsules issue was false;

g.    whether Glenmark committed fraud; and

h.    whether Plaintiff and the Class are entitled to damages and the proper measure for such damages.

29.    *Typicality.* Plaintiff's claims are typical of other members of the Class in that, among other things, all members of the Class were similarly situated with respect to economic loss claims and were comparably injured through Defendant's wrongful conduct. As explained above, each member of the Class suffered a substantially similar economic injury by purchasing Glenmark's adulterated and worthless potassium chloride capsules. Further, there are no defenses available to Defendant that are unique to Plaintiff with respect to her economic damages claims.

30.    *Adequacy of Representation.* Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel that is experienced in complex consumer class action and product liability litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class. Furthermore, Plaintiff has no interests that are antagonistic to those of the Class.

31.    *Superiority*. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The economic damages or other financial detriment suffered by individual members of the Class are relatively small compared to the burden and expense of individual litigation of their claims against Defendant. It would thus be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if members of the Class could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

32.    The Class's damages exceed the $5,000,000 amount-in-controversy requirement. There are an estimated tens of thousands of members who would be entitled to the greater of ADTPA statutory damages of $100 each or their actual damages trebled, plus statutory costs and attorney's fees in addition to either remedy. The Class also seeks punitive damages on the alternative fraud

claim, which could exceed $5,000,000 based on the nature and extent of Glenmark's course of conduct.

## CAUSES OF ACTION

### Count I: Alabama Breach of Express Warranty

33.    Glenmark breached its express warranties of USP and CGMP compliance and therapeutic equivalence.

34.    "Under Alabama law, 'any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty.'" *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1338 (11th Cir. 2015) (quoting Ala. Code § 7-2-313(1)(a)). As explained above, Glenmark expressly warranted to its immediate customers, drug distributors and pharmacies, that its potassium chloride, extended release USP capsules complied with the USP standard—a warranty extended to patients on the labeling—and expressly warranted that its capsules complied with CGMP requirements and were therapeutically equivalent to competing capsules. Those representations create express warranties under Alabama law.

35.    "Under Alabama law, a manufacturer's express warranty, like any contractual obligation, may run in favor of a third-party beneficiary. . . . To recover under a third-party beneficiary theory, the complainant must show: 1) that the contracting parties intended, at the time the contract was

created, to bestow a direct benefit upon a third party; 2) that the complainant was the intended beneficiary of the contract; and 3) that the contract was breached." *Lisk*, 792 F.3d at 1338.

36.     When Glenmark warranted USP compliance, CGMP compliance, and therapeutic equivalence, Glenmark "intended to benefit remote purchasers like [Ms. Brewton] and the proposed [Alabama] class members." *Id*. After all, Glenmark's direct customers such as distributors and pharmacies do not themselves take drugs—they buy them from Glenmark for sale to patients. The pertinent quality standards exist to protect patients, and absent compliance with them, Glenmark's capsules could not and would not have been prescribed to or dispensed to patients or purchased by them. *See, e.g.*, *id*. (drawing support from "the surrounding circumstances in determining whether an end user is a third-party beneficiary," including "the foreseeability of harm to end users" who would be protected by the pertinent representations). Further, Glenmark expressly warranted to patients on the product labeling that its drugs were USP compliant.

37.     As set forth above, Glenmark's express warranties were false: its capsules did not comply with the USP, CGMP, or therapeutic equivalence standards.

38.     Under Alabama law, "it is not necessary to show any particular reliance by the buyer to give rise to [express] warranties," *Massey-Ferguson,*

16

*Inc. v. Laird*, 432 So. 2d 1259, 1261 (Ala. 1983), but even if it were, Ms. Brewton and the members of the putative class relied on their prescription medication being what Glenmark represented it was.

39.     Having paid more than they otherwise would have (zero dollars) for Glenmark's adulterated drugs, the Class is entitled to recover benefit of the bargain damages pursuant to Alabama Code § 7-2-714.

40.     Ms. Brewton gave pre-suit notice by email and certified mail to Glenmark's counsel on June 4, 2025, prior to filing this case.

## Count II: Alabama Fraud

41.     Glenmark's representations of USP and CGMP compliance and therapeutic equivalence were fraudulent.

42.     Under Alabama law, "a plaintiff alleging fraud must prove four elements (1) a false representation; (2) that the false representation concerned a material existing fact; (3) that the plaintiff relied upon the false representation; and (4) that the plaintiff was damaged as a proximate result of the reliance." *Billy Barnes Enters v. Williams*, 982 So. 2d 494, 499 (Ala. 2007) (citation omitted). It is not necessary, under Alabama law, to prove scienter, except to obtain punitive damages: "an innocent misrepresentation is as much a legal fraud as an intended misrepresentation." *Id*.

43.     As set forth above, Glenmark's representations of USP and CGMP compliance and therapeutic equivalence were false.

17

44.     Compliance with the USP, CGMP, and therapeutic equivalence standards is not just material—it is a necessary condition for entry into the generic prescription drug market.

45.     Ms. Brewton and the absent class members relied on Glenmark's false representations to their detriment, which they can and will prove through common evidence based on standardized written misrepresentations and a standardized "course-of-conduct," as repeatedly endorsed by the Supreme Court of Alabama: "where plaintiffs allege and prove a standard claim for fraud based on misrepresentations with a common thread, as is the case here, their cause is maintainable as a class action." *CVS Caremark Corp. v. Lauriello*, 175 So. 3d 596, 609 (Ala. 2014) (collecting authority); *see also Ex parte Daimler Chrysler Corp.*, 952 So. 2d 1082, 1090–91 (Ala. 2006) (explaining that Alabama recognizes indirect reliance consistent with Restatement (Second) of Torts § 533)).

46.     To obtain punitive damages, the class will also establish the requisite knowledge or recklessness based on Glenmark's history of persistent disregard of CGMP requirements, repeated citations and warning letters, and release of tens of millions of adulterated capsules based on inadequate quality controls. *See, e.g.*, *Burroughs Corp. v. Hall Affiliates, Inc.*, 423 So. 2d 1348, 1354 (Ala. 1982) ("We have held that an intentional misrepresentation, made with either knowledge of its falsity or reckless

18

disregard as to its truth, is considered in this state as the variety of fraud which will support punitive damages.").

47.    "[I]n a case of fraud in the inducement of a purchase, damages should be assessed based on the difference between the value of the property as represented and its actual value," under the "benefit of the bargain rule" that "Alabama has long followed." *Sanford v. House of Discount Tires*, 692 So. 2d 840, 842 (Ala. Civ. App. 1997) (citing *Reynolds v. Mitchell*, 529 So. 2d 227 (Ala. 1988)). The class is entitled to the full purchase price—i.e., patient payments and insurance/third-party payor payments—under Alabama's collateral source rule. *See, e.g.*, *Centon Elecs., Inc. v. Bonar*, 614 So. 2d 999, 1004 (Ala. 1993) (holding that Alabama's "collateral source rule would apply to [] fraud claims," among other tort claims).

## Count III: Alabama Deceptive Trade Practices Act (in the alternative to fraud)

48.    Glenmark's false representations of USP and CGMP compliance and therapeutic equivalence violated Alabama's Deceptive Trade Practices Act, Ala. Code. § 8-19-1 et seq., in at least the following ways:

    a.  "Representing that" Glenmark's capsules have "characteristics" or "qualities that they do not have." § 8-19-5(5).

b.  "Representing that" Glenmark's capsules "are of a particular standard, quality, or grade" even though "they are of another." § 8-19-5(7).

c.  "Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." § 8-19-5(27).

49.    By committing those "acts or practices declared unlawful" by the ADTPA, without which Ms. Brewton and the class never would have purchased Glenmark's capsules as set forth above, Glenmark "cause[d] monetary damage to" Ms. Brewton and the class, entitling them each to seek the greater of their actual damages or $100, treble damages, costs, and attorney's fees. Ala. Code § 8-19-10.

50.    ADTPA's bar on class actions in Alabama state court "does not apply in federal court. Rule 23 controls." *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331 (11th Cir. 2015); *see also, e.g.*, *Phillips v. Hobby Lobby Stores*, 2019 U.S. Dist. LEXIS 229264, *13 (N.D. Ala. 2019) (holding that *Lisk* remains controlling despite statutory amendments); *Jones v. Coty*, 362 F. Supp. 3d 1182 (S.D. Ala. 2018) (same); *Carter v. L'Oreal*, 2017 U.S. Dist. LEXIS 155232 (S.D. Ala. 2017) (same).

51.    Because Glenmark does not maintain a place of business or assets in Alabama , Ms. Brewton was not required to give the fifteen-day pre-

suit notice specified for ADTPA claims in Alabama Code § 8-19-15. Nevertheless, Ms. Brewton gave written notice by email and certified mail to Glenmark's counsel on June 4, 2025.

## PRAYER FOR RELIEF

Plaintiff and the Class respectfully request the following relief:

    a.    Compensatory damages in an amount to be determined at trial;

    b.    Statutory damages under the ADTPA;

    c.    Treble damages under the ADTPA;

    d.    Punitive damages;

    e.    Costs and attorneys' fees under the ADTPA;

    f.    Pre- and post-judgment interest; and

    g.    All other appropriate relief.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to Local Civil Rule 11.2, undersigned counsel for plaintiff hereby certifies that this case is related to *Butler et al. v. Glenmark Pharmaceutical, Inc.*, No. 2:24-cv-080907-EP-JSA, which is against the same defendant, involves the same counsel for the parties, and features similar claims arising from the same conduct by Glenmark.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1

Pursuant to Local Civil Rule 201.1, undersigned counsel for plaintiff hereby certifies that this action is excluded from compulsory arbitration because the monetary demand exceeds $150,000, exclusive of interest and costs and any claim for punitive damages.

**SHAH LAW GROUP, LLC**
*Attorneys for Plaintiff Martha Brewton, on behalf of herself and all others similarly situated*

By: */s/Roshan D. Shah*
    Roshan D. Shah, Esq.

Dated: June 23, 2025

**THE BLOCK FIRM LLC**
*Attorneys for Plaintiff Martha Brewton, on behalf of herself and all others similarly situated*

By: */s/Aaron K. Block*\*
    Aaron K. Block

\*  *pro hac vice* admission forthcoming